IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **SUPERSEDING INDICTMENT** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| MARTIN FANO, | ) | CASE NO. 1:19CR79 |
| | ) | Title 18, United States Code, |
| Defendant. | ) | Sections 1341, 1343, 1346, and 2 |

GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise specified:

1. The City of Cleveland (hereinafter "the City") was a political subdivision within the State of Ohio.

2. The Cuyahoga County Land Reutilization Corporation ("CCLRC"), also known as the Cuyahoga County Land Bank, was a non-profit, government-purposed organization registered in the State of Ohio. CCLRC invited qualified demolition contractors from its list to bid on batches of properties to demolish.

3. A contractor performing demolition work in the City, both as part of a CCLRC project and for a private entity, was required to obtain permits from the City before the CCLRC or private entity would deem the job completed and issue payment.

4. Defendant MARTIN FANO owned and operated ABC Construction LLC ("ABC Construction"), a business that provided demolition and construction services, among other things, in the Cleveland, Ohio, area.

5. Defendant and his business performed demolition work for the City, CCLRC, and private parties.

6. Rufus Taylor ("Taylor") (charged separately) was employed by the City as the Chief of the Demolition Bureau and was an agent of the City. Among other responsibilities, Taylor was responsible for conducting inspections and for supervising others conducting inspections. A contractor performing demolition work in the City was required to pass two inspections, conducted by the Demolition Bureau, as part of any demolition job, including private jobs: (1) a clean-hole and sewer bulk (or "bulkhead") inspection and (2) a final compliance inspection. If a contractor passed the final compliance inspection, Taylor or one of his subordinates signed the permit for the job. This final, signed permit was required before a contractor could receive payment for the job.

## COUNTS 1 – 7
(Honest Services Mail and Wire Fraud, 18 U.S.C. §§ 1341, 1343, 1346, and 2)

The Grand Jury charges:

7. The allegations contained in paragraphs 1 through 6 of this Indictment are incorporated by reference as if stated fully herein.

### The Scheme to Defraud

8. From in or around June 2016, and continuing through in or around November 2017, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant MARTIN FANO devised and intended to devise a scheme and artifice to defraud and to deprive the City

2

and the citizens of the City of their intangible right to the honest services of Rufus Taylor (charged separately), a City official, through bribery.

## The Purposes of the Scheme

9. The purposes of the scheme included, but were not limited to the following:

    a. For Defendant to receive favorable official action from the City by paying Taylor bribes in exchange for faster service and other favorable treatment regarding demolition inspections, both on specific matters pending and expected to be pending before Taylor and as opportunities arose, so that Defendant could in turn obtain faster payment for demolition jobs, which gave Defendant a competitive advantage by being able to move on to other demolition jobs in a more timely manner than Defendant's competitors, and;

    b. For Defendant to receive favorable official action from the City by paying Taylor bribes in exchange for favorable treatment on other City matters in exchange for Taylor pressuring and advising other City officials regarding specific matters pending and expected to be pending before those other officials and as opportunities arose, so that Defendant could in turn avoid compliance requirements, obtain faster service and processing by the City, and receive other favorable treatment, and;

    c. For Defendant to unlawfully benefit and enrich himself and Defendant's business through bribery of Taylor and the resulting favorable official action.

## Manner and Means of the Scheme

10. The manner and means by which Defendant carried out the scheme included, but were not limited to, the following:

      a.      Defendant gave, offered, and promised things of value to Taylor, including multiple cash payments and free meals, to obtain faster service and other favorable treatment from Taylor and the City of Cleveland.

      b.      Defendant made such payments to Taylor with the intent to influence, and in exchange for, official acts, including Taylor's own decisions and actions on matters, such as conducting inspections and issuing permits, and the scheduling of the same, as well as Taylor's influencing the official acts of other officials by advising or pressuring those officials. Defendant knew and intended that Taylor's advice would form the basis for official acts by other public officials that would benefit Defendant, and further knew and intended that Taylor would use his supervisory authority over other City employees to exert pressure on them to perform official acts that would benefit Defendant.

      c.      From time to time, Defendant offered to pay, and did pay, Taylor money in exchange for Taylor to use his official position to provide, and agree to provide, assistance in ensuring that work performed by Defendant's business would be quickly inspected after completion.

      d.      From time to time, Defendant offered to pay, and did pay, Taylor money in exchange for Taylor to use his official position to more quickly finalize and provide Defendant with the necessary signed permits for work performed by Defendant and his business.

      e.      From time to time, Defendant and Taylor spoke on the phone and in person to discuss Defendant's requests for official action favorable to Defendant and Defendant's businesses, both for actions taken or directed by Taylor himself, and actions of other City officials that Taylor would influence by advising and pressuring those other officials.

f.  From time to time, Defendant offered to pay, and did pay, for meals for Taylor in exchange for Taylor to use of his official position to provide Defendant with continued favorable treatment.

g.  Defendant used, and caused and directed others to use, interstate wire communications and mail delivered by the United States Postal Service.

Acts in Furtherance of the Scheme

11.  The acts caused by Defendant in furtherance of the scheme included, but were not limited to, the following:

12.  Beginning in or around June 2016, and continuing through in or around January 2017, Defendant paid, and offered to pay, Taylor sums of cash.

13.  In or around June 2016, Defendant submitted, and caused to be submitted, bids to CCLRC for demolition work at 909 East 72nd Street, Cleveland, Ohio ("909 East 72nd Street") and 9213 Marshall Avenue ("9213 Marshall Avenue"), Cleveland, Ohio.

14.  In or around June 2016, CCLRC awarded ABC Construction the demolition work for 909 East 72nd Street and 9213 Marshall Avenue.

15.  In or around June 2016, CCLRC issued ABC Construction a "Notice to Proceed" with the work for 909 East 72nd Street and 9213 Marshall Avenue.  Pursuant to these "Notices to Proceed," ABC Construction was to complete the work at both locations on or before August 8, 2016.

16.  On or about August 16, 2016, Defendant obtained an extension to complete the work at 909 East 72nd Street and 9213 Marshall Avenue, until on or before September 23, 2016.

17. On or about August 29, 2016, Defendant sent, and caused to be sent, an email to CCLRC confirming that ABC Construction would start demolition at 909 East 72nd Street that day.

18. On or about August 30, 2016, Taylor, acting in his official capacity, conducted the clean-hole bulkhead inspection at 909 East 72nd Street and advised Defendant that he passed the clean-hole bulkhead inspection.

19. In or around September 2016, Defendant agreed to perform demolition work at 12109 Castlewood Avenue, Cleveland, Ohio ("12109 Castlewood Avenue"), for a private client.

20. On or about September 20, 2016, Defendant sent, and caused to be sent, an email to CCLRC confirming that ABC Construction would start demolition at 9213 Marshall Avenue on September 21, 2016.

21. On or about September 20, 2016, Taylor, acting in his official capacity, conducted the clean-hole bulkhead inspection at 12109 Castlewood Avenue and advised Defendant that he passed the clean-hole bulkhead inspection.

22. On or about September 23, 2016, Taylor, acting in his official capacity, conducted the clean-hole bulkhead inspection at 9213 Marshall Avenue and advised Defendant that he passed the clean-hole bulkhead inspection.

23. On or about September 26, 2016, Taylor, acting in his official capacity, approved and signed the final compliance permit for 9213 Marshall Avenue.

24. On or about September 26, 2016, Defendant sent, and caused to be sent, an email to CCLRC, along with attachments, seeking payment for the work performed by ABC Construction at 9213 Marshall Avenue. These attachments included the final compliance permit signed by Taylor.

6

25. On or about September 28, 2016, Taylor, acting in his official capacity, approved the final compliance permit for 909 East 72nd Street.

26. On or about September 29, 2016, Defendant sent, and caused to be sent, an email to CCLRC, along with attachments, seeking payment for the work performed by ABC Construction at 909 East 72nd Street. These attachments included the final compliance permit signed by Taylor.

27. On or about September 30, 2016, Defendant met with Taylor and told Taylor that he "appreciated" Taylor for taking care of Defendant with the inspections, and then paid Taylor $200 cash.

28. On or about October 5, 2016, at approximately 10:05 a.m., Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant stated that he had received a bill for almost $1,000 from "them [the City]" for cutting grass at a property on Siam Avenue. Defendant asked Taylor if Defendant could do anything about it.

29. On or about October 5, 2016, at approximately 3:22 p.m., Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant stated that his workers had made more progress than he expected on a demolition at a property on East 141st Street in Cleveland, Ohio, and that they received fill dirt. Defendant asked if he could take a picture, and stated that he had tried to call the assigned inspector, but realized how late it was. Taylor responded that he would come to the property and do the clean-hole bulkhead inspection.

30. On or about October 7, 2016, Defendant and Taylor had a conversation on the telephone. During the conversation, Taylor stated that he "appreciate[d]" Defendant for the "inspections," referring to Defendant's $200 payment to Taylor on September 30, 2016. Defendant responded that he "appreciate[d]" Taylor as well, and "wish[ed] I [Defendant] could

7

do some more [pay Taylor more money]." Defendant then stated that they could get together at the beginning of the week.

31. On or about October 7, 2016, CCLRC sent Defendant, via the U.S. Mail, a check in the amount of $18,835, which included the initial payment for ABC Construction's demolition work at 909 East 72nd Street in the amount of $18,025.

32. On or about October 12, 2016, Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant indicated that his employee, Employee 1, was trying to reach Taylor. Defendant further stated that his company was doing a job that needed a sewer bulk inspection, and stated that he had a picture of the sewer bulk, indicating that he wished to use the picture in place of an in-person inspection.

33. On or about October 14, 2016, CCLRC sent Defendant, via the U.S. Mail, a check in the amount of $7,875, which was the initial payment for ABC Construction's demolition work at 9213 Marshall Avenue.

34. On or about October 19, 2016, Defendant sent, and caused to be sent, an email to CCLRC, along with an attachment, seeking payment for the remaining balance on the 909 East 72nd Street job.

35. On or about November 4, 2016, Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant stated that he was calling Taylor for an "ok" on an inspection. Defendant also asked if Employee 1 had sent Taylor a picture, referring to a photograph intended to substitute for an in-person inspection.

36. On or about November 10, 2016, CCLRC sent Defendant, via the U.S. Mail, a check in the amount of $875, for ABC Construction's demolition work at 9213 Marshall Avenue.

37. On or about December 23, 2016, Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant asked Taylor about a bill Defendant had received related to a "board-up" job—a job in which the City would pay to have a vacant/condemned property sealed up with sheets of plywood. Taylor responded that he could not do anything until he returned to his office. Defendant asked if Taylor could "see if you could, find out what it is and make it go away and I'll just give you, hook you up with the, with some cash on it." Taylor responded that once the issue is part of the "paper trail" it was "risky." Defendant replied that they could meet at a restaurant. Taylor then stated that he would see what he could do, because Defendant brought up the offer.

38. On or about December 28, 2016, Defendant paid Taylor an additional $60 cash in exchange for continued favorable treatment.

39. On or about January 6, 2017, CCLRC sent Defendant, via the U.S. Mail, a check in the amount of $925, for ABC Construction's demolition work at 909 East 72nd Street.

40. On or about January 11, 2017, Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant asked if Taylor knew a particular electrical inspector, Inspector 1. Taylor indicated that he did know him. Defendant explained that he had not called Inspector 1 for a rough-in inspection and had closed up the walls, meaning that he had covered up the electrical work that needed to be inspected. Defendant asked if Taylor could "talk to him [Inspector 1] if there was a problem." Defendant asked if another particular inspector, Inspector 2, could sign off on his electrical inspection. Taylor stated that Inspector 2 worked residential inspections and could only sign off on the roof. Defendant then described a dispute he was having with a third party regarding a faulty appliance, and asked if "we [Taylor and Defendant] could put somebody on him" and if Taylor could get an inspector to "lean on

9

him [the third party] hard" and stated that he wanted to "teach the guy a lesson," meaning that he wanted Taylor to use his position to see that the third party would be subject to additional inspections.

41. On or about January 12, 2017, Defendant and Taylor had a conversation on the telephone. During the conversation, Taylor stated that he was following up about Defendant's request that Taylor assist him with Inspector 1. Taylor agreed to speak with Inspector 1. Defendant stated that maybe Inspector 1 might sign off without actually looking at the house, meaning that he wanted Taylor to see if Inspector 1 would do that. Taylor asked Defendant, "You got me on that, right?" Defendant stated, "Yeah, yeah." They also discussed the bill Defendant had received for the "board-up" job they had discussed, and Defendant asked if Taylor ever got any information for Defendant.

42. On or about January 13, 2017, Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant and Taylor discussed what Taylor would tell Inspector 1 about the inspection at Defendant's property. Defendant stated that he hoped Inspector 1 "don't look real hard," indicating he wanted Inspector 1 to sign the required paperwork without closely examining the work.

43. On or about January 18, 2017, Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant stated that he had taken some pictures of a demolition site after trying to get in contact with an inspector, Taylor, and another City employee. Defendant also stated that "it was all history [the hole had been backfilled with dirt]." Defendant reiterated that the "hole is gone man." Defendant gave Taylor the address to send an inspector, and said they would meet for lunch. Taylor told Defendant what to say to another City

10

official about the filled hole. During the conversation, Taylor also stated that he had been trying to get in touch with Inspector 1.

44. On or about January 19, 2017, Defendant and Taylor had a conversation on the telephone. During the conversation, Taylor told Defendant he had spoken with Inspector 1, who would then call Defendant. Taylor stated that Defendant should not miss the call.

45. On or about January 24, 2017, at approximately 3:06 p.m., Defendant and Taylor had a conversation on the telephone. During the conversation, referring to plans for Defendant to meet with Inspector 1, Defendant stated that he did not have Inspector 1's cellular phone number. Taylor stated that Defendant should not leave the property, and that Taylor tried to "hook you [Defendant] in there." Defendant responded that he knew that. Taylor replied that he was trying to get Defendant "out of there [done with property with inspections signed off]." Defendant responded that he "appreciate[d] it." Taylor then stated that Inspector 1 was doing what Taylor and Defendant had discussed.

46. On or about January 24, 2017, at approximately 4:10 p.m., Defendant met with Inspector 1, and Inspector 1 signed off on the electrical inspection.

47. On or about January 24, 2017, at approximately 5:04 p.m., Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant stated that Inspector 1 "hooked everything right up [signed off on the inspection as Defendant desired]," and that Inspector 1 said he would "look the other way" on some things. Taylor responded that he has to "always take care of you [Defendant] since you [Defendant] take care of me [Taylor]." Taylor further stated that he was glad Defendant did not "blow this," and was glad Inspector 1 took care of Defendant. They then discussed Taylor checking the City computer system to see if the permit was closed out, and they discussed other outstanding business Defendant had before the

City. Defendant stated that he "appreciate[d] it," and said that maybe they would get a meal together tomorrow.

48. On or about January 27, 2017, Defendant paid Taylor an additional $200 cash in exchange for continued favorable treatment, including Taylor's assistance with the electrical inspection that Inspector 1 had performed.

49. On or about February 6, 2017, Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant described a conversation he had with an inspector who worked under Taylor about a recent job. Defendant explained that he told the inspector that Taylor had done the inspection, and that the inspector had "caught me off guard," and Defendant "didn't know what the heck to say," and that Defendant would not "throw you [Taylor] under the bus." Taylor had not in fact done the inspection. Taylor stated that Defendant was placing Taylor at risk, and that Taylor did not mind looking out for Defendant.

50. On or about March 7, 2017, Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant asked if Taylor could obtain a certificate of disclosure faster than it would normally take. Taylor responded that Defendant did not need Taylor to do that, and Defendant could show up in person at a City office to obtain the certificate. Defendant stated that they would get together soon and were "due for some Chinese." Defendant also stated, "Thanks a million" for Taylor's help.

51. On or about April 10, 2017, Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant asked Taylor if Taylor could speak with a prosecutor about a pending case regarding a property on Siam Avenue.

52. On or about July 11, 2017, Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant stated that one of his subcontractors or

employees had buried concrete on one of Defendant's jobs. Taylor stated that no one should bury anything, and doing so placed inspectors at risk. Defendant stated that he was going to "have to let that one go" because he does not know where on the property the concrete is buried, as it was a big house. Taylor stated that if the debris was found, it could jeopardize the inspector. Defendant stated that it had been around a month and a half to two months, and so was too late to dig it up. Taylor responded, "It ain't never too late to do right." After discussing another topic, Defendant stated, "Let's forget about our last conversation, here." Taylor clarified that he meant the conversation about the buried concrete, and Defendant affirmed. Taylor stated that he provides a service to Defendant to get Defendant "out the hole [done with the job and able to move on to the next job]." Taylor also stated that Defendant should call Taylor if he ever needs Taylor's services. Defendant replied that he would.

53. On or about August 22, 2017, Defendant and Taylor had a conversation on the telephone. During the conversation, Defendant stated that they needed to "get together" because Defendant needed to "turn some stuff into cash," and he had "no help" and "need[ed] a little help." They discussed two jobs for which Defendant had permits pending with the City. Taylor stated that he could stamp the permit for the property on Kempton Avenue. Defendant asked if he could stamp "the other one too," referring to another property that had not been completed, and he would later "make it right." Taylor said he could not stamp that permit.

### The Execution of the Scheme

54. On or about the dates set forth below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, transmitted and caused to be

transmitted by means of wire and radio communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| Count | Date | Interstate Wire Communication |
|---|---|---|
| 1 | 9/26/16 | E-mail to CCLRC, with subject line "9213 Marshall Ave. Demo invoice," with attachments |
| 2 | 9/29/16 | E-mail to CCLRC, with subject line "909 E. 72 st. DEMO & CHANGE ORDER," with attachments |
| 3 | 10/19/16 | E-mail to CCLRC, with subject line "909 E. 72 St. retainage request," with attachment |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

55. On or about the dates listed below, in the Northern District of Ohio, Eastern Division, Defendant, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, used and caused to be used the United States mail and private and commercial interstate carriers to deliver the following items, each mailing constituting a separate count:

| Count | Approximate Date | Mailing |
|---|---|---|
| 4 | 10/7/16 | Check issued by CCLRC to Defendant and ABC Construction, in the amount of $18,835 |
| 5 | 10/14/16 | Check issued by CCLRC to Defendant and ABC Construction, in the amount of $7,875 |
| 6 | 11/10/16 | Check issued by CCLRC to Defendant and ABC Construction, in the amount of $875 |
| 7 | 1/6/17 | Check issued by CCLRC to Defendant and ABC Construction, in the amount of $925 |

All in violation of Title 18, United States Code, Sections 1341, 1346, and 2.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.